UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FELIPE CRUZ HERNANDEZ,<br><br>  Plaintiff,<br><br>  v.<br><br>G. SWARTHOUT, Warden,<br><br>  Defendants. | No. 2:12-cv-2706 AC P<br><br><br><br>ORDER |

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. The parties have consented to the jurisdiction of the undersigned. ECF Nos. 4 & 8. Petitioner contends that his right to a fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution was violated by the trial court's admission of a "blood volume experiment." ECF Nos. 1 & 13 at 4. Respondent has answered. ECF No. 9. Petitioner has filed a traverse. ECF No. 13.

For the reasons that follow, the petition will be denied.

FACTUAL AND PROCEDURAL BACKGROUND

I.     Overview

Petitioner Felipe Cruz Hernandez was charged with the first degree murder of his wife,

////

////

1

Leticia Barrales Ramos.  2 CT 373-74.[1]  Her body was never found.  A "blood volume experiment" that was conducted by an FBI agent, and the results of the experiment, were admitted into evidence at trial.  8 RT 2162-205.[2]  This experiment was offered to show that blood stains found under the couple's carpet – which was linked to Ms. Ramos by DNA analysis – indicated that Ms. Ramos had suffered a fatal amount of blood loss.  8 RT 2162-205.

Petitioner's counsel had earlier argued for the exclusion of this evidence on the ground that it was produced too late, and that it was unreliable since the experiments were still on-going.  8 RT 1137-42.  However, once the experiments were completed, petitioner's counsel did not again raise the issue of whether the evidence was reliable.  Specifically, she did not object on the ground that the evidence was unreliable or that it did not meet the legal standard for the admission of such evidence.  Petitioner's counsel examined the agent about the experiment outside the presence of the jury.  8 RT 1154-58.  Counsel cross-examined the agent before the jury on the merits of the experiment.  8 RT 1792-819 and 1835-39, 10 RT 2917-69, 11 RT 2982 and 2999-3003 and 12 RT 3379-83.  Finally, counsel presented two experts to rebut the agent's testimony and evidence.  11 RT 3091-3208; 11 RT 3215 to 12 RT 3296.

Petitioner was convicted of second degree murder.  3 CT 730-31.  The sole issue presented on appeal and in the federal habeas petition is a challenge to the evidence of the blood volume experiment.

II.     The Evidence at Trial

    A.     Ms. Ramos Goes Missing; the Investigation[3]

On March 20, 2009, Leticia Barrales Ramos filed for divorce from her husband, petitioner Felipe Cruz Hernandez, and sought custody of their 10-year-old daughter.  Ms. Ramos served divorce papers on petitioner on March 23, 2009.  She had been dating another man, and petitioner suspected that she was cheating.

On April 11, 2009, Ms. Ramos attended a party with petitioner's niece.  After the party,

---

[1] "CT" refers to the Clerk's Transcript on Appeal, Lodged Docs. 1-3.
[2] "RT" refers to the Reporter's Transcript on Appeal, Lodged Doc. 4 (Vol. 1 ("1 RT")) through Lodged Doc. 15 (Vol. 12 ("12 RT")).
[3] See Lodged Doc. 21 (Opinion of the California Court of Appeal) at 2-7.

Ms. Ramos and the niece returned to their respective homes. That night, the couple's neighbor heard someone crying and movement on the stairs. On April 12, 2009, Ms. Ramos was gone. On that morning, the niece – who was in possession of Ms. Ramos's wallet containing her identification and $1,050 in cash – went to Ms. Ramos's apartment, as planned, but Ms. Ramos was not there. Petitioner told the niece that Ms. Ramos had gone to "Carolina" on an emergency basis to visit a relative. Later, petitioner told others that Ms. Ramos had gone to "North Carolina" because her brother had been in an accident.

That same day, petitioner's brother saw 15 to 20 dried blood droplets and a blood smear on the passenger door frame of petitioner's truck. Petitioner cleaned the blood off and explained that a friend had hurt himself. Later, forensic testing matched blood from the rear floor mat of petitioner's truck to Ms. Ramos. On April 13, 2009, after petitioner got off work, he rented a Rug Doctor® carpet cleaner and upholstery tool, and returned them the following day. Blood was found on the upholstery tool, but was never identified. Also on April 13, 2009, the niece entered the couple's apartment and noticed that some furniture had been moved.

On April 14, 2009, after Ms. Ramos's supervisor called the police about his missing employee, a police officer conducted a welfare check at the apartment where the couple lived and interviewed petitioner. Petitioner told the officer that Ms. Ramos had gone to Mexico to help a sick relative. Notwithstanding the divorce papers Ms. Ramos had served upon him a month earlier, petitioner told the officer that no divorce proceedings were pending and that everything was fine between his wife and him. The officer saw no sign of a crime in the apartment.

Petitioner then began telling people that his wife had been seen in Mexico but was having trouble returning as she lacked authorization to be in the United States. He told people that he had received a call from someone who said Ms. Ramos was in Mexico, and was having trouble getting a visa, but that she would call petitioner later. Petitioner discouraged people from contacting the police or putting up fliers because, he said, his wife was obtaining fake documents so that she could return to this country.

On April 20, 2009, Ms. Ramos's cousin filed a missing person report with the authorities. The cousin then received a call from a man claiming to have seen Ms. Ramos at the border. The

1  niece also received a call, apparently from the same man, claiming to have seen Ms. Ramos trying
2  unsuccessfully to cross the border.  The FBI assisted in the missing person investigation, and
3  searched unsuccessfully for Ms. Ramos in Mexico.
4       On May 12, 2009, petitioner gave a statement at the police station.  He told the police that
5  on the night of April 11, 2009, his wife told him that she was getting a ride with friends to the
6  airport because her brother needed her.
7       On May 28, 2009, FBI agents executed a search warrant at the couple's apartment.  They
8  found blood stains on four pieces of living room furniture and on an altar of saints in the hallway,
9  a piece of hair with the root intact that had been forcibly removed, and blood spatter.  DNA
10 testing showed that the blood and the hair belonged to Ms. Ramos.  The living room carpet tested
11 positive for blood.  When FBI agents pulled back the carpet, they saw several enormous
12 bloodstains that had soaked through the carpet and the carpet pad onto the concrete floor.  The
13 stains spanned a total surface area of approximately 16.6 feet.  DNA tests revealed the blood on
14 the carpet belonged to Ms. Ramos.  Petitioner was arrested that same day, May 28, 2009.
15      Petitioner's sister visited petitioner at the jail.  During one visit, petitioner told his sister
16 that if blood was found in his apartment, he wanted her to call his lawyer and falsely state that she
17 saw Ms. Ramos have a miscarriage or an abortion in the apartment.  During another visit,
18 petitioner asked his sister to phone Ms. Ramos's family in Mexico, pose as Ms. Ramos, and say
19 that she was fine.  Petitioner also asked his sister to have Ms. Ramos's family call the police and
20 report that Ms. Ramos was fine.

     B.     Initial Defense Challenge To Blood Experiment

22      FBI Agent John Cauthen, who was present at the search of the apartment, testified that the
23 blood in the carpet was more than he had seen in other crime scenes where the victim had bled to
24 death.  4 RT 1101-02.  He compared the blood stains to those he had seen at the scene of
25 beheadings.  RT 1708.  Cauthen revealed that tests were being conducted to determine what
26 volume of blood would cause the stains that were discovered under the carpet.  4 RT 1103-04.
27      Outside the presence of the jury, petitioner's counsel argued that those test results should
28 be excluded because they were late discovered evidence.  4 RT 1137-42.  Counsel contended that

4

the prosecutor had first provided discovery relating to these tests on the same day – November 24, 2009 – that Cauthen had revealed their existence on cross-examination. Id. at 1137. Counsel argued that the FBI had discovered the blood stains under the carpet six months before – on May 28, 2009 – but had not conducted any blood volume tests until two days after the trial had started, thus ambushing petitioner and depriving him of the opportunity to cross-examine on the experiment. Id. at 1138 39. Counsel also argued that the results would be unreliable because the tests were still being conducted. Id. at 1139. Counsel did not argue about the merits or validity of the test results or the technique used to generate them. Id. at 1137 42. When asked if she had "anything further?" petitioner's counsel continued to argue only that the evidence was being produced too late. Id. at 1142-43.

The trial court declined to exclude the test results at that point on late discovery grounds, and added,

> [N]ow, whether or not this information is reliable or what the testing shows, of course, I have no information on that at this point, and we'll have to take that one step at a time . . ..

4 RT 1143.

C. Testimony of FBI Agent Hopkins and Evidence of the Blood Experiment

Petitioner's counsel examined Agent Hopkins, who had devised and conducted the experiment, in a hearing outside the presence of the jury pursuant to Cal. Evid. Code § 402.[4] 4 RT 1154-58. Near the end of the hearing, the trial court asked the defense twice whether there was "anything else?" 4 RT 1156, 1158. Petitioner's counsel did not raise the issue of reliability, nor did she request exclusion of the experiment evidence under People v. Kelly, 17 Cal. 3d 24 (1976) ("Kelly"), or indicate that she might do so at a later time.

On direct examination before the jury, Hopkins testified in relevant part as follows:

> Q.   And based on your findings at the apartment itself, and I am just talking about the bloodstain on the carpet . . . did that cause you to do any further investigation in order to make any findings regarding what you saw?

---

[4] A "402 hearing" is the California in limine procedure for determining admissibility of evidence. Cal. Evid. Code § 402(b).

5

|  |  |  |
|---|---|---|
| A: | I did. | |

      A:    I did.

      Q:    And what struck you about the carpet, and what did it cause you to do?

      A:    Well, the bloodstains on the carpet are so large and in different colors, and I knew that the visual estimate – to try to estimate the volume of blood on the carpet visually would be very inaccurate. I decided to conduct a bloodstain experiment.

      Q:    And what sort of bloodstain experiment were you attempting to conduct?

      A:    I was trying to conduct an experiment which would allow me to estimate the blood volume that was found on that carpet.

      Q:    And have you ever undertaken experiments of this nature before?

      A:    Not with blood loss estimation, no.

8 RT 2163.

      Hopkins went on to describe his experiment at length, without defense objection. To conduct his experiment, Hopkins purchased a carpet and pad like those in the couple's apartment. He obtained ten liters of horse blood that had been treated with an anticoagulant. He placed the carpet and pad on a concrete floor, poured the horse blood over it to make five stains, and compared the volume of blood poured to the size of the stains. He also measured the effects of adding water to the stains and attempting to remove the blood with a Rug Doctor® carpet cleaner. He concluded that the stains he saw in the couple's apartment were made by 4.16 liters of human blood. 8 RT 2166-2205.

      Hopkins' testimony was not limited to the blood volume experiment. He had been the lead agent at execution of the search warrant at petitioner's apartment on May 28, 2009. 4 RT 928-48. He testified at length about the search. As regards the blood evidence, Hopkins testified that the quantity of blood he visually observed in and under petitioner's carpet was similar to that he had seen at a crime scene involving a victim who had been hacked to death with a machete. 7 RT 1829-30.

////

////

6

D. <u>Defense Case</u>

1. <u>Petitioner's Testimony</u>

Petitioner testified that he had been awakened by his wife's crying on the night of April 11, 2009.  9 RT 2443.  She told petitioner that she had received a phone call, that her brother in North Carolina had been in an accident, and she had to go to him.  9 RT 2445.  After much conversation, Ms. Ramos left, at about 3:30 a.m.  9 RT 2454.  The next morning, on April 12, 2009, petitioner checked the phone, and saw that no phone calls had come in or gone out the night before; he knew that his wife had misled him.  9 RT 2499-500.  The following day, April 13, 2009, on his way home from work, petitioner picked up a carpet cleaning tool because, before his wife left on the night of April 11, 2009, she told him that she wanted to clean the carpet (where she had previously spilled garbage).  9 RT 2510.  However, when petitioner got home, he received a call from a woman telling him that his wife was in Mexico.  9 RT 2511 13.  He started to clean the carpet, as his wife had requested, but stopped when he realized that his wife had lied to him and had gone to Mexico.  9 RT 2576-79.

After he was arrested, petitioner began following the advice of a person he could not identify.  That person told him to ask his sister to impersonate his wife, and to tell his lawyer that his wife was cleaning up blood from the carpet before she disappeared.  10 RT 2689-95.  Petitioner denied cleaning the area where his wife's blood stains were found.  10 RT 2811.  He testified that he did not know how his wife's blood came to be on the entertainment center, the couch, the chair, the loveseat and the altar.  10 RT 2814-16.  He testified he did not see the blood stains on the carpet.  10 RT 2819.

2. <u>Expert Testimony</u>

Forensic consultant Peter Barnett testified for the defense as an expert criminalist.  11 RT 3091-3095.  He testified about the blood evidence generally, including the quantity of blood in the carpet.  Barnett testified that the blood at the scene did not support a conclusion that a homicide had been committed in the apartment.  He stated that the bloodstains themselves did not support any conclusions about what had happened.  11 RT 3118-19.  He opined that there were too many unknowns for Hopkin's experiment to be fruitful, and that it would be very difficult to

7

conduct an accurate blood volume experiment. 11 RT 3117. He did not have an opinion regarding the volume of blood loss or whether it was consistent with a fatal bleed-out. 11 RT 3170.

Dr. Michael Oda, a research scientist who studied blood and who served on the American Heart Association's review panel for scientific research, testified as an expert in scientific experiments. 11 RT 3215-34. Dr. Oda reviewed the experiments conducted by Agent Hopkins and opined that "the manner in which the experiments were done was highly inaccurate." 11 RT 3240. He noted that "the investigator had. . . a fairly uninformed approach about the nature of blood when he took on this experiment." 11 RT 3238. Dr. Oda explained that the addition of anti-coagulant to the horse blood would have affected the rate at which the blood spread. 11 RT 3235-36. He was concerned about the lack of evidence that the carpet stains from the apartment had been made at the same time. 11 RT 3236. He criticized Agent Hopkins' failure to account for several variables, including the positioning of the body, the rate of blood pour or blood flow, differences in blood hematocrit, and room temperature. 11 RT 3236-40. The lack of repetition in the experiment also cast doubt on the scientific reliability of its outcome. 11 RT 3239-40. Dr. Oda testified that it would have been practically impossible to conduct an appropriate scientific experiment to determine what Agent Hopkins hoped to determine. 11 RT 3238-39.

    E.  <u>Outcome</u>

On December 22, 2009, the jury acquitted petitioner of first degree murder, but convicted him of second degree murder, a lesser included offense. 3 CT 730-31. On January 22, 2010, the trial court sentenced petitioner to state prison for an indeterminate term of 15 years to life. 3 CT 783-84.

 III.  <u>Post-Conviction Proceedings</u>

Petitioner appealed to the California Court of Appeal, Third Appellate District. He presented a single ground for reversal: that admission of the experiment evidence violated <u>People v. Kelly</u>, <u>supra</u>. In support of his claim, petitioner contended first that trial counsel had preserved the issue for appeal, and in the alternative that any failure to preserve the issue constituted ineffective assistance of counsel. Lodged Doc. 18 (Appellant's Opening Brief). On January 4,

1  2012, the Court of Appeal affirmed the conviction. Lodged Doc. 21. The court held that

2  petitioner had forfeited the issue of the experiment's admissibility because he did not object to its

3  admissibility on Kelly grounds at trial. Id. at 24-27. The court held further, regarding petitioner's

4  attempt to excuse forfeiture on ineffective assistance grounds, that any Kelly objection would

5  have failed because Kelly did not apply to the blood volume experiment. Id. at 28-33. Finally,

6  the court found that even if the evidence was erroneously admitted, its admission was harmless

7  error. Id. at 33-38.

8  On February 8, 2012, petitioner filed a petition for review with the California Supreme

9  Court. Lodged Doc. 22. The California Supreme Court denied the petition without comment or

10 citation on March 14, 2012. Id.

11 Petitioner did not seek collateral relief in the state courts.

12 Petitioner filed his federal petition on November 2, 2012. ECF No. 1. The Petition

13 asserts that the admission of the experiment evidence violated petitioner's rights under the Fifth,

14 Sixth and Fourteenth Amendments to the U.S. Constitution. Id. Respondent answered on

15 February 11, 2013. ECF No. 9. The Answer asserts that petitioner's constitutional claim is

16 unexhausted and procedurally defaulted, and also argues that the Petition should be denied on the

17 merits. Petitioner filed a traverse on April 17, 2013. ECF No. 13.

18                    STANDARDS GOVERNING HABEAS RELIEF UNDER AEDPA

19 28 U.S.C. § 2254, as amended by the AEDPA, provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

27 The statute applies whenever the state court has denied a federal claim on its merits,

28 whether or not the state court explained its reasons. Harrington v. Richter, 131 S. Ct. 770, 785

1   (2011).  State court rejection of a federal claim will be presumed to have been on the merits

2   absent any indication or state-law procedural principles to the contrary.  Id. at 784-85 (citing

3   Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is

4   unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

5   "The presumption may be overcome when there is reason to think some other explanation for the

6   state court's decision is more likely."  Id. at 785.

7       The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

8   principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

9   U.S. 63, 71 72 (2003).  Clearly established federal law also includes "the legal principles and

10  standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

11  (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

12  may constitute "clearly established Federal law," but circuit law has persuasive value regarding

13  what law is "clearly established" and what constitutes "unreasonable application" of that law.

14  Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

15  1057 (9th Cir. 2004).  However, only circuit law that "arose under AEDPA" has such persuasive

16  value.  Glebe v. Frost, 135 S. Ct. 429, 431 (2014).  Also, "circuit precedent does not constitute

17  'clearly established Federal law, as determined by the Supreme Court.'"  Id.

18                          THE DUE PROCESS CLAIM

19      Petitioner alleges that the trial court committed reversible error by admitting the

20  experiment evidence, thus depriving him of the fair trial guaranteed by the Fifth, Sixth and

21  Fourteenth Amendments to the United States Constitution.

22      I.      The Claim Is Procedurally Defaulted

23      On direct review, the California Court of Appeal held that petitioner's challenge to the

24  experiment evidence had been forfeited by counsel's failure to object to the evidence in the trial

25  court under People v. Kelly, 17 Cal. 3d 24 (1976).  Lodged Doc. 21 at 24.  The court relied on

26  California's contemporaneous objection rule, codified at Cal. Evid. Code § 353(a).  Id.

27      As a general rule, a federal habeas court will not review a claim rejected by a state court if

28  the decision of the state court rests on a state law ground that is independent of the federal

10

1  question and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729

2  (1991); Beard v. Kindler, 558 U.S. 53, 55 (2009).  The fact that the state court alternatively ruled

3  on the merits does not erase the effect of a procedural bar. Harris v. Reed, 489 U.S. 255, 264 n.10

4  (1989).  The Ninth Circuit has squarely held that California's contemporaneous objection rule is

5  both independent and adequate within the meaning of Coleman and progeny, and therefore

6  supports application of the procedural default doctrine. Melendez v. Pliler, 288 F.3d 1120, 1125

7  (9th Cir. 2002); see also Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir.), cert. denied, 528

8  U.S. 965 (1999).[5]  Accordingly, petitioner's claim is defaulted absent a showing of cause for the

9  default and actual prejudice as a result of the alleged violation of federal law. Coleman, 501 U.S.

10  at 753.

11        Petitioner argues that his procedural default is excused because his counsel's failure to

12  object on Kelly grounds constituted ineffective assistance of counsel.  Ineffective assistance of

13  counsel can, if pleaded and proved, establish cause for a default. Murray v. Carrier, 477 U .S.

14  478, 488 (1986); Edwards v. Carpenter, 529 U.S. 446, 451 (2000).  To prove ineffective

15  assistance, a petitioner must show that counsel's representation fell below an objective standard

16  of reasonableness, and that counsel's deficient performance prejudiced the defense. Strickland v.

17  Washington, 466 U.S. 668, 692, 694 (1984).  Trial counsel "cannot have been ineffective for

18  failing to raise a meritless objection." Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005);

19  Cert. denied, 546 U.S. 1137 (2006).  See also Kimmelman v. Morrison, 477 U.S. 365, 382 (1986)

20  (to prevail under Strickland, petitioner must establish that foregone motion would have been

21  meritorious).  Here, the California Court of Appeal held that Kelly did not bar the experiment

22  testimony.  Lodged Doc. 21 at 28-33.  This court is bound by the state appellate court's

23  determination of California law. Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Hicks v. Feiock,

24  485 U.S. 624, 629 30 (1988).  Because a Kelly objection would have been meritless, counsel

25  cannot have been ineffective for failing to make it.

---

[5] Petitioner argues that he did timely object to the experiment evidence on the basis of unreliability and Kelly.  The court must reject this argument.  First, the appellate court specifically found that petitioner did not object on those grounds.  Second, the record plainly shows that petitioner did not object on those grounds.

If petitioner's cause and prejudice theory is construed liberally to allege ineffective assistance of counsel for failure to make a federal due process objection to the testimony, the result is the same. The erroneous admission of evidence violates due process only if the evidence is so irrelevant and prejudicial that it renders the trial as a whole fundamentally unfair. Estelle v. McGuire, 502 U.S. 62 (1991). Agent Hopkins' experiment appears to this court to have been of dubious probative value. But this court's independent view of the evidence is not the measure of due process. Because petitioner was provided a full opportunity to cross examine Agent Hopkins, and to present the testimony of two expert witnesses who criticized the experiment and challenged its conclusions, the trial court's decision to let the jury decide the probative value of the evidence did not render the trial fundamentally unfair. An objection based on the U.S. Constitution would have fared no better than an objection based on Kelly, so counsel cannot have been ineffective for failing to raise it.

Because the California Court of Appeal invoked an independent and adequate procedural bar, petitioner's claim is defaulted. Petitioner has not established cause and prejudice to overcome the default.

## II. The Claim Is Also Unexhausted

Habeas petitioners are required to exhaust state remedies before seeking relief in federal court. 28 U.S.C. § 2254(b)(1)(A) (no habeas relief may be granted unless "the applicant has exhausted the remedies available in the courts of the State," or an exception applies). The exhaustion doctrine ensures that state courts will have a meaningful opportunity to consider allegations of constitutional violations without interference from the federal judiciary. Rose v. Lundy, 455 U.S. 509, 515 (1982); see also Farmer v. Baldwin, 497 F.3d 1050, 1053 (9th Cir. 2007) ("This so-called 'exhaustion requirement' is intended to afford 'the state courts a meaningful opportunity to consider allegations of legal error' before a federal habeas court may review a prisoner's claims") (quoting Vasquez v. Hillery, 474 U.S. 254, 257 (1986)).

A petitioner satisfies the exhaustion requirement by fairly presenting his claims to the highest state court before presenting them to the federal court. See Baldwin v. Reese, 541 U.S. 27, 29 (2004); Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276

(1971). A federal claim is fairly presented if the petitioner has described the operative facts and the federal legal theory upon which his claim is based. See Wooten v. Kirkland, 540 F.3d 1019, 1025 (9th Cir. 2008); cert. denied, 556 U.S. 1285 (2009). General appeals to broad constitutional principles, such as due process and the right to a fair trial, are insufficient to establish exhaustion. Gray v. Netherland, 518 U.S. 152, 162-63 (1996).

In his petition for review filed in the California Supreme Court, petitioner referred to the United States Constitution for the first and only time in the course of his state court challenge to the blood experiment evidence -- and did so in such general terms that no constitutional claim was fairly presented. For both these reasons, the reference failed to exhaust petitioner's federal claim.

### A. Presentation Of The Federal Constitutional Issue For The First Time In The Petition For Review Does Not Exhaust State Court Remedies

Petitioner presented a single claim to the California Court of Appeal: that the trial court's admission of testimony about the blood volume experiment violated People v. Kelly, supra. Lodged Doc. 18. The brief cited no federal constitutional provision, and made no constitutional arguments regarding the reliability of the experiment. The only federal case cited was Strickland v. Washington, for the proposition that any failure to preserve the Kelly issue constituted ineffective assistance of counsel. Id. at iii (Table of Authorities), 82 (citing Strickland). In his subsequent petition for review, filed in the California Supreme Court, petitioner mentioned the Sixth Amendment guarantee of a fair trial for the first time. Lodged Doc. 21.

The exhaustion requirement is not satisfied by the presentation of a claim in a procedural context in which its merits will not be addressed absent special circumstances. Castille v. Peoples, 489 U.S. 346 (1989). Respondent argues that petitioner's failure to raise his constitutional claim in the California Court of Appeal precluded its fair presentation to the California Supreme Court. Respondent cites Rule 8.500(c)(1) of the California Rules of Court for the proposition that petitioner cannot present a claim to the California Supreme Court unless he has "timely raised the same claim to the California Court of Appeal." ECF No. 9 at 27. Respondent overstates the rule, which does not limit the authority of the California Supreme

1  Court to consider and decide an issue raised for the first time in a petition for review. People v.
2  Superior Court (Ghilotti), 27 Cal. 4th 888, 902 (2002).[6]

3  Nonetheless, under Castille, a habeas petitioner does not satisfy the exhaustion
4  requirement by raising his federal claims for the first time in a petition for discretionary review
5  filed with the state's highest court. Casey v. Moore, 386 F.3d 896, 918 (9th Cir. 2004), cert.
6  denied, 545 U.S. 1146 (2005) (discussing and applying Castille). Rather, at least where review in
7  the state's highest court is discretionary, exhaustion requires presentation of the federal claim at
8  every level of state court review. See id. at 915-918.

9  In California, non-capital criminal convictions are reviewable in the state's highest court
10 only if that court grants discretionary review. Petitioner is therefore in a position
11 indistinguishable from those of the Pennsylvania petitioner in Castille and the Washington State
12 petitioner in Casey: each raised only state law issues in the lower state appellate court, and then
13 added federal constitutional claims in his petition for discretionary review in his state's highest
14 court. See Casey, 386 F.3d at 916-17. In both Castille and Casey, the federal claims were held to
15 be unexhausted by this presentation. Casey's requirement of presentation at each level of state
16 court review has been applied to California habeas petitioners who, like petitioner here, presented
17 their federal constitutional claims for the first time in a petition for review filed with the
18 California Supreme Court. See Reynoso v. Lamarque, 2007 U.S. Dist. LEXIS 15723 (E.D. Cal.
19 2007); Dixon v. Brown, 2010 WL 1028720, at *3 (N.D. Cal. 2009); Tran v. Uribe, 2012 U.S.
20 Dist. LEXIS 187619, at *15-16 (C.D. Cal. 2012); Dionne v. California, 2013 U.S. Dist. LEXIS
21 69387, at *25-26 (E.D. Cal. 2013). Accordingly, under Castille and Casey, petitioner's federal
22 claims are unexhausted.

23  B.  The Petition For Review Did Not Fairly Present The Federal Claim

24  Even if the claim were not unexhausted by virtue of petitioner's failure to present it to the

---

[6] Rather, under the Rule, "[a]s a policy matter, on petition for review the Supreme Court *normally* will not consider an issue that the petitioner failed to timely raise in the Court of Appeal." Cal. R. Ct. 500(c)(1) (emphasis added). This rule does not preclude California Supreme Court consideration of any issue in a case, whether or not raised below and whether or not included in the petition for review. Ghilotti, supra; see also Cal. Rules of Court, Rule 8.516(b).

intermediate court of appeals, the claim would be unexhausted because the petition for review did no more than mention the Sixth Amendment in passing. Such general reference, unsupported by federal authority or by any argument why the Sixth Amendment was violated by admission of the blood experiment evidence, fails to satisfy the requirement of fair presentation.

In his petition to the state's highest court, petitioner presented the following question: "Did the trial court commit reversible error in admitting evidence of a blood volume experiment to prove homicide in a 'no-body' case where the experiment employed a new scientific technique that had not qualified for acceptance in the relevant scientific community?" Lodged Doc. 21 at 2. This language directly reflects the non-constitutional Kelly issue that had been presented to the intermediate appellate court. See Lodged Doc. 18 at 55. The statement of the question did not alert the California Supreme Court to the fact that petitioner was asserting a claim under the United States Constitution. See Duncan v. Henry, 513 U.S. 364, 365-66 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

The petition for review also included the following initial statement of the necessity for review:

> Review is necessary to establish for the lower courts that an investigator who does not have the requisite scientific credentials to construct a reliable method of testing blood volume, and whose methods were not approved by any relevant scientific community and in fact were substantially discredited by qualified scientists, should not be allowed to present the results of that testing before the jury and the admission of such test results violates a defendant's Sixth Amendment rights to a fair trial.

Lodged Doc. 21 at 2.

The ensuing argument in support of the petition mentioned the Sixth Amendment once and only once, in its heading. Id. at 4. The body of the argument contained no discussion of the constitutional issue, no theory of how the evidence violated any right guaranteed by the Sixth Amendment, and no citation whatsoever to federal authority or even to California cases discussing federal constitutional principles. Id. at 4-31. While petitioner is correct that he need

1  not cite "book and verse on the federal constitution," Picard, 404 U.S. at 277 (quoting Daugharty
2  v. Gladden, 257 F.2d 750, 758 (9th Cir. 1958), mere use of the phrases "fair trial" and "Sixth
3  Amendment" is patently insufficient to exhaust a claim of constitutional error. See Gray v.
4  Netherland, 518 U.S. at 163. It is well established that passing reference to a broad constitutional
5  concept, such as due process or the right to a fair trial, is inadequate to exhaust. Fields v.
6  Waddington, 401 F.3d 1018, 1021 (9th Cir.), cert. denied, 546 U.S. 1037 (2005); Shumway v.
7  Payne, 223 F.3d 982, 987-88 (9th Cir. 2000); Hiivala v. Wood, 195 F.3d 1098, 1106 (9th Cir.
8  1999) (per curiam), cert. denied, 529 U.S. 1009 (2000). "Exhaustion demands more than drive-
9  by citation, detached from any articulation of an underlying federal legal theory." Castillo v.
10 McFadden, 399 F.3d 993, 1003 (9th Cir.), cert denied, 546 U.S. 818 (2005).

11 Because the petition for review contained no more than a "drive-by" citation to general
12 Sixth Amendment principles, without any articulated theory why the alleged evidentiary error
13 violated specific constitutional guarantees, it did not exhaust petitioner's incipient federal claim.
14 Because an unexhausted claim may nonetheless be denied on the merits, 28 U.S.C. § 2254(b)(2),
15 the court proceeds to address the substance of the claim.

16     III.    <u>The Admission of the Experiment Evidence Does Not Warrant Habeas Relief</u>

17 Finally, even if petitioner properly presented his constitutional claim to the state courts,
18 the claim fails on the merits. Petitioner alleges that the admission of the results of the blood
19 volume experiment violated his constitutional right to a fair trial. If the California Supreme
20 Court's denial of the petition for review constituted an adjudication of the merits of this claim,
21 and AEDPA standards therefore apply,[7] relief would be unavailable because no clearly
22 established federal law governs the claim. The U.S. Supreme Court has never "made a clear
23 ruling that admission of irrelevant or prejudicial evidence constitutes a due process violation
24 sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.
25 2009). Accordingly, the state court cannot have unreasonably applied federal law within the
26 ///
27
28 [7] See 28 U.S.C. § 2254(d).

16

1  meaning of the AEDPA.  See Wright v. Van Patten, 552 U.S. at 125-26; Moses v. Payne, 543
2  F.3d at 1098 (9th Cir. 2008).

3       Even under pre-AEDPA standards, the claim fails.  The erroneous admission of evidence
4  warrants habeas relief only when it results in the denial of a fundamentally fair trial in violation of
5  the right to due process.  Estelle v. McGuire, 502 U.S. at 72.  To meet this standard, evidence
6  must both be irrelevant and "of such quality as necessarily prevents a fair trial."  McKinney v.
7  Rees, 993 F.2d 1378, 1380, 1384 (9th Cir.) (quoting Lisenba v. California, 34 U.S. 219, 236
8  (1991)), cert. denied, 510 U.S. 10120 (1993).  "[O]nly if there are no permissible inferences the
9  jury may draw from the evidence can its admission violate due process."  Jammal v. Van de
10 Kamp, 926 F.2d 918, 920 (9th Cir. 1991).  Due process does not generally require the exclusion
11 of evidence subject to challenge for unreliability, which is traditionally a question for the jury.
12 Perry v. New Hampshire, 132 S.Ct. 716, 728 (2012).

13      This case is unlike McKinney, supra, a pre-AEDPA case in which the Ninth Circuit found
14 due process violated by admission of evidence that the petitioner possessed knives unrelated to
15 the charged homicide, in which the victim's throat was slit.  That evidence was both wholly
16 irrelevant to the charges and unduly inflammatory.  McKinney, 993 F.2d at 1385 (evidence "was
17 not relevant to the questions before the jury" and "served only to prey on the emotions of the
18 jury").  Here, the quantity of the victim's blood found in petitioner's apartment was entirely
19 relevant to the murder charges.  Agent Hopkins' testimony supported permissible inferences that
20 fatal injuries were inflicted in the home shared by petitioner and the victim.  Nothing about the
21 evidence was inherently or unduly inflammatory.

22      Petitioner argues that Agent Hopkins' conclusion about blood volume was unreliable
23 because his experiment was unreliable.  Petitioner may well be correct.  However, defense
24 counsel challenged the experimental process and its results on cross-examination, and presented a
25 medical expert and a criminalist to debunk the experiment.  The Supreme Court has repeatedly
26 emphasized that the adversarial process is the preferred way of testing the reliability of evidence,
27 and fully protects rights of the accused.  See Perry, 132 S. Ct. at 728 (rights to cross-examination
28 and assistance of counsel permit defendants to challenge evidence and juries to assess its

1 reliability, obviating need for constitutional limitations on potentially unreliable evidence);
2 Barefoot v. Estelle, 463 U.S. 880, 898-899 (1983) ("the rules of evidence generally extant at the
3 federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its
4 weight left to the fact finder, who would have the benefit of cross examination and contrary
5 evidence by the opposing party").

Finally, as the California Court of Appeal correctly noted, any error in admission of the blood volume evidence was harmless. The evidence against petitioner was more than sufficient to support the verdict without reference to the specific volume of blood that was shed in the apartment.[8] More importantly in the habeas context, it is highly unlikely in the context of the trial record as a whole that Agent Hopkins' testimony regarding his experiment and his conclusions regarding blood volume had any influence on the verdict. See Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993) (habeas relief available only where constitutional error has substantial and injurious effect or influence in determining the jury's verdict).

For all these reasons, petitioner's constitutional challenge to admission of the blood volume experiment is denied on the merits as well as on grounds it is unexhausted and procedurally defaulted.

## INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

To the extent (if any) that the petition can be construed with extreme liberality to state an ineffective assistance of counsel claim as substantive grounds for relief, and not simply as grounds to excuse default, the claim is meritless. For the reasons previously explained, counsel cannot have performed deficiently by failing to object to the blood experiment on either Kelly or Sixth Amendment grounds, because such objections would have been meritless. See Kimmelman v. Morrison, 477 U.S. at 382; Juan H. v. Allen, 408 F.3d at 1273. Moreover, because the verdict was not adversely affected by the jury's consideration of the evidence, petitioner cannot establish prejudice. Strickland, 466 U.S. at 693-94.

---

[8] The facts that Ms. Ramos' blood was found in the apartment and that the bloodstains covered a total of about 16.6 square feet, together with the presence of her blood in petitioner's truck, the circumstances of her disappearance, petitioner's various conflicting statements about her absence, and his jailhouse statements to his sister, amply support a jury finding that he killed his wife.

18

CONCLUSION

Accordingly, for all the reasons set forth above, IT IS HEREBY ORDERED that:

1. The petition for writ of habeas corpus (ECF No.1) is DENIED; and

2. The court declines to issue a certificate of appealability.

DATED: April 6, 2015

/s/ Allison Claire
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE